IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| TAMARA STERLING, Ed.D. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No.: 3:25cv381 |
| | ) |
| SCRIPPS MEDIA, INC. | ) |
| t/a WTVR | ) |
| Serve:  Corporation Service Company | ) |
| Registered Agent | ) |
| 100 Shockoe Slip, 2nd Floor | ) |
| Richmond, VA 23219 | ) |
| | ) |
| Defendant. | ) |

## **COMPLAINT**

Plaintiff Tamara Sterling, Ed.D, by counsel, states as follows for her Complaint against

Scripps Media, Inc. t/a WTVR and/or CBS6 ("WTVR" or "Scripps").

### NATURE OF ACTION

1.     This is an action for defamation.  On May 21, 2024, WTVR, through its reporter

Melissa Hipolit, published a news story titled "Extra hotel rooms, rental cars, and a $22,000 travel

bill. What's going on with school leader spending?"[1]  The story purported to expose details about

the travel expenses of Sterling, who, only months before, had resigned as the Superintendent of

Petersburg City Public Schools ("PCPS"). Among other things, the story said (i) Sterling "charged

taxpayers more than $22,000 while traveling to conferences"; (ii) "[a]t ***three*** of the conferences,

Sterling booked more than one room ***for herself***"; (iii) Sterling was "***field-tripping*** around the

country"; and (iv) the Petersburg "school division paid ***$6,309.02*** for Sterling to book ***two rooms***

_____

[1] https://www.wtvr.com/news/local-news/petersburg-superintendent-travel-expenses-may-21-2024 (visited on May 20, 2025).

and stay in San Antonio for an entire week from February 12-19, [2023]" whereas superintendents from Hanover County and Henrico County only stayed four nights and only spent "$988.68" and "$2,224.09" respectively (as prominently highlighted with a color graphic[2] showing the alleged expenses and pictures of the three school leaders). *Id.*

2.      The story also indicated that Sterling's expenses were improper and even illegal. In reference to the expenses, for example, Hipolit asked a local parent "Do you think this deserves a closer look?" to which the parent replied: "Yes yes I definitely do . . . If money is tight and we're spending over $20,000 on ***field trips*** for the school superintendent, just doesn't seem to make sense to me." *Id.* Hipolit then went further when she invited comments from Senator Lashrecse Aird (the state senator for the Petersburg, Virginia area) about Sterling's travel expenses after showing her copies of records. Sen. Aird said "There ***just really is no rationale*** that can be used to explain ***the excess*** that's appearing in the records ***you found***." *Id.* Hipolit also asked Sen. Aird "Do you think it's fair to book a whole week at the site when the conference is only a couple of days?" to which Aird said: "***Not on the public's dime*** . . . .When you're talking about adding on additional days or additional time spent, that should ***not be at the public's expense*** . . . " *Id.* Hipolit closed the story with Aird's statements that "[t]he school board chairman will have to have increased scrutiny when approving these requests and these expenditures ***unfortunately*** because of what ***we're seeing today***" and the local parent's similar remark that "the school board ***needs to seriously look at this*** . . . It's about the kids, ***not blowing money***." *Id.*

3.      In short, the news story accused Sterling of spending inordinate amounts of money galivanting around the country on personal leisure trips on the public's dime, doing so illegally by misusing public funds, and subsequently resigning from PCPS for doing so.

---

[2] As explained herein, this was just one of *many* false and misleading graphics in the story.

4.    None of these accusations, implications, or statements were, or are, true.  To the contrary, all of Sterling's travel expenses were legitimate and above-board.  Indeed, in all but one of the trips at issue, Sterling did ***not*** have two hotel rooms (just one), and the one instance where she did have two rooms, the other room was booked as a "workroom" to store various materials being used as part of a retreat for the many PCPS school professionals who were at the conference. It was not used as an "extra" sleeping room – "*for*" Sterling or *for* anyone connected with Sterling (e.g., Sterling's family). As well, Sterling did not have Petersburg pay for **extra or excess** non-working days for her travels.  Instead, in those instances where she stayed in hotels one or two days *immediately prior* to the conference at issue, Sterling was either attending pre-conference professional certification programs provided by the organization sponsoring the conference or networking with colleagues on site. Finally, all of Sterling's travel was pre-submitted and pre-*approved* by the Chair of the Petersburg School Board.  Sterling did not hide anything from anyone regarding her travel.

5.    Even worse, WTVR, through Hipolit, _knew_ that its false narrative about Sterling was false. At the time WTVR published the story, Hipolit _knew_ that PCPS had not paid for extra rooms for Sterling for _three_ trips.  Indeed, documents in Hipolit's possession _prior to publication_ directly refuted such a claim.  Hipolit also _knew_ that PCPS had _not_ paid over $6,000 for Sterling to attend a conference in San Antonio in 2023. Instead, documents in Hipolit's possession _prior to publication_ showed that PCPS had only paid $4,286 for that trip.

6.    Just as important, Hipolit _knew_ full well that her various color graphics comparing Sterling's travel expenses with those of other local superintendents were knowingly misleading. Specifically, the records in Hipolit's possession _prior to publication_ simultaneously showed that WTVR was*, on the one hand, *overstating* Sterling's expenses and, on the other, *understating* the

expenses of those to whom she was being compared.  Indeed, for the one graphic that appears in both the print and video versions of the news story, if WTVR had told the truth about the expenses for the three named superintendents, the graphic would have showed $1,866.72 in expenses for Henrico's superintendent (almost _double_ the graphic's number) but only $4,286 in expenses for Sterling (a drop of almost _one third_ from the graphic's number).  Hipolit and WTVR knowingly ignored and/or turned a blind eye to the clear contradictory evidence _in their possession_ in order to embellish the alleged disparities between Sterling and her fellow superintendents and, in turn, highlight a false narrative about Sterling and her allegedly excessive travel expenses.

7.      Finally, Hipolit had **no evidence whatsoever** to hint, imply, suggest, or show that Sterling (i) had somehow booked "extra" or "excess" rooms for her own personal (non-business) use on her trips for PCPS, (ii) was doing anything improper or illegal with her travel expenses, or (iii) left her role in Petersburg because of travel expense problems or concerns.  Yet, that did not stop Hipolit and WTVR from fervently fanning the flames of falsity on these very topics – mainly by publishing false and exaggerated travel expense numbers in its story and also presenting such false and exaggerated numbers to third parties (including the local state Senator) to evoke false and misleading statements of shock and negative reactions from them.

8.      As a result of this so-called news coverage, Sterling files this defamation action to hold Scripps liable for the harm it has inflicted on her life.

## Parties

9.      Sterling is an individual resident of Texas. She is a lifelong and respected educator. She holds a Bachelors' degree from Texas Southern University, a Master's of Education degree from Prairie View A&M University, and a Doctor of Education degree from the University of New England.  Before coming to Virginia, Sterling was a school administrator in Chicago, Houston,

and Providence, Rhode Island. She was then the Director of Secondary Education at Accomack Public Schools for three years beginning in 2014; the Superintendent for the City of Frankling Public Schools for more than five years (2017 through 2022), and the Superintendent for PCPS from December 2022 through April of 2024.  While at the City of Franklin, Sterling helped turn Franklin's school division from having to operate under a Memorandum of Understanding (MOU) with the Virginia Department of Education due to its failing schools, to having its schools exit the MOU within a year's time.

10.    Defendant Scripps is a media corporation that owns and operates dozens of local television stations around the country, including WTVR. It is organized under Delaware law, and its principal place of business is 312 Walnut St., Suite 2800, Cincinnati, Ohio 45202.

11.    WTVR operates the metro Richmond, Virginia CBS television affiliate, trading as CBS6.  It broadcasts from its studio at 3301 West Broad Street, Richmond, Virginia 23220. WTVR reaches more viewers than any other television station in Central Virginia. WTVR's television viewing area encompasses numerous localities, including the City of Richmond, City of Petersburg, City of Hopewell, Caroline County, Chesterfield County, Dinwiddie County, Goochland County, Hanover County, Henrico County, New Kent County, Powhatan County, and Spotsylvania County.  It also has a robust internet presence through wtvr.com.

12.    At all times relevant herein, Melissa Hipolit, the author and reporter of the false and defamatory news story at issue in this lawsuit, was an employee of WTVR and/or Scripps.  In this regard, she was at all times acting in her capacity as an employee of WTVR and/or Scripps and acting in the course and scope of her employment as an employee of WTVR and/or Scripps when undertaking the broadcasting, publishing, and reporting actions described herein.

**JURISDICTION AND VENUE**

13.     This Court has subject matter jurisdiction pursuant to the "diversity jurisdiction"

provisions of 28 U.S.C. § 1332.  In particular, Sterling is a citizen of Texas; Scripps is a citizen of

Ohio, and the matter in controversy exceeds $75,000.

14.     Venue is proper in this district and division pursuant to 28 U.S.C. § 1391 and Local

Rule 3(B)(4), as this is the district and division where a substantial part of the events or omissions

giving rise to the claims herein occurred.

**FACTUAL BACKGROUND**

**A.     Sterling's Tenure As Superintendent Of Petersburg City Public Schools.**

15.     In late September, 2022, the Petersburg City School Board voted to hire Sterling as

its new school Superintendent. She began working in that role on December 2022, and over the next

fifteen months, she helped PCPS make numerous strides, including:

- Adopting a new curriculum that meets diverse learning styles' needs.

- Introducing STEAM Fridays, which allowed all students to engage in science, technology, engineering, arts, and mathematics projects.

- Expanding partnerships with Virginia State University with efforts to impact the teacher shortage with the first Hybrid Education, Residency, Opportunity (HERO) program.

- Decompressing teacher salaries for veteran teachers who served over ten years with the division.

- Building a new playground at Cool Spring Elementary School with community partners donating over $70,000.

- Initiating a new cell phone policy, that increased students instructional focus that made an impact on learning and student achievement.

- Enhancing literacy initiatives by providing books for every student to take home and read with family.

- Implementing an attendance initiative that resulted in a significant monthly increase

6

in student attendance at every school in PCPS.

• Redesigning the division and school's website that promoted timely and effective communication and information.

• Implementing new instructional technology for all elementary schools and Blandford 6th Grade Academy.

16.    On March 24, 2024, Sterling submitted her resignation as PCPS Superintendent, effective April 30, 2024.  Sterling resigned for personal reasons.  Her resignation had nothing to do with any concerns or issues related to her travel or her travel expenses.

**B.    Sterling's Out-Of-State Travel During Her PCPS Tenure.**

17.    During her tenure as PCPS Superintendent, Sterling, as is common for school leaders, attended numerous professional conferences, where she took educational classes, networked, and built relationships with colleagues from around the country.  Relevant here, Sterling attended five out-of-state conferences from February 2023 through February 2024.

**(1)    AASA Conference – February 2023 – San Antonio, TX.**

18.    First, Sterling attended the AASA – the School Superintendent's Association – 2023 annual education conference in San Antonia, Texas. The AASA bills itself as "the premier association for school system leaders and serves as the national voice for public education and district leadership on Capitol Hill,"[3] and its annual education conference is widely viewed as a "go to" event for school superintendents.

19.    The conference itself took place on February 16-18, 2023, and occurred on site at the San Antonio Marriott Rivercenter Hotel.

20.    Sterling, however, also participated in the AASA's National Superintendent Certification Program, which preceded the conference by a few days and occurred on February 13-

---

[3] https://www.aasa.org/about-aasa (visited on May 21, 2025)

15, 2023. The certification program also took place on site at the San Antonia Marriott Rivercenter Hotel.

21.     The certification program was especially important for Sterling and her ability to be a successful PCPS superintendent. As the AASA explains, the program "offers . . . superintendents a unique chance to engage in impactful, high-quality professional development."[4] It "equips leaders with the knowledge to navigate the complex challenges in today's educational landscape," gives participants "access to a supportive network of peers," and provides "practical tools and insights superintendents need to lead effectively." *Id.*

22.     The certification is a two-year program – with each certification session occurred in the days immediately preceding the AASA's annual education conference. Each "graduating" group from the program is called a cohort. Sterling was in the East Cohort Class of 2024, and their initial group picture was taken in San Antonio and posted on the AASA website. Sterling is in the picture, as highlighted by the red arrow.



*Id.*

---

[4]     https://www.aasa.org/professional-learning/event/2024/09/25/default-calendar/national-superintendent-certification-program-east#:~:text=Cohort%20members%20will%20be%20matched,professional%20friendship%20throughout%20their%20careers. (visited on May 21, 2025)

23.    Pre-trip, Sterling submitted paperwork which identified the purpose of her travel as "National Education Conference," identified her attendance dates as "2/13/2023" through "02/18/23" and explained that she "will attend various education sessions" which "will be conducted by local and national presenters and will provide resources to benefit PCPS." Her trip was fully approved.

24.    As for the trip itself, Sterling traveled to the AASA certification and annual conference programs on Sunday February 12, 2023 and returned from the two programs on Sunday, February 19, 2023. She stayed in ***one room*** at the San Antonion Mariott Rivercenter, and only ***one room*** was billed to PCPS.

**(2)    Urban Superintendent's Collaborative – June-July 2023 – Nevada.**

25.    Second, Sterling attended the Urban Superintendents' Collaborative, Inc. Conference in Henderson, Nevada. The conference occurred from June 28, 2023 to June 30, 2023 and took place at the Green Valley Ranch and Resort Spa and Casina in Henderson, Nevada.

26.    Sterling flew into the Las Vegas, Nevada airport on June 26, 2023 and flew out of that airport at 5:25 a.m. on July 2, 2023. She also rented a car because the distance from the Las Vegas airport to Hendersonville is at least 15 miles, and Sterling needed to travel both ways.

27.    Sterling booked (and PCPS paid for) ***one room*** while at the conference. And Sterling flew into Nevada two days ahead of the conference's actual start date because she used the day *before* the conference to collaborate with various school administrators on projects that would help PCPS. Indeed, as a result of those collaborations, Sterling was able, upon her return, to implement strategies for training central office personnel and increasing student attendance.

28.    Sterling submitted her travel paperwork well in advance of the conference, identified the days she would be gone, and, among other things, said the conference "will provide professional development on topics impacting public education." The trip was fully approved by PCPS.

### (3)    SREB Making Schools Work Conference – July 2023 – Orlando, FL.

29.     Third, Sterling attended the SREB Making Schools Work Conference in Orlando, Florida.  The conference is a mandated school improvement conference for school systems like PCPS, and PCPS sent over 50 school officials (teachers and administrators) to the conference.

30.     The SREB conference occurred on July 18-21, 2023, but Sterling and her PCPS colleagues also used the occasion of the conference to have an off-site leadership retreat – with a meet- and-greet, and a team building activity at Disney Springs.

31.     PCPS paid for Sterling's lodging at the conference, as well as her initial flight to Florida.  However, Sterling paid for her own flight home to Virginia.  And while PCPS booked two rooms for Sterling at the conference, only one was used *for* Sterling for lodging.  The other room was booked because it was going to house numerous materials for the retreat.  Sterling did ***not*** utilize the room for herself or anyone connected to her (i.e., family members) during the trip.

32.     Sterling submitted paperwork for the travel well in advance of the conference and said the conference will provide "classroom tested tools and strategies that can be used to spark student engagement and create caring school cultures."  The trip was fully approved by PCPS.

### (4)    NABSE Conference – Nov-Dec, 2023 – New Orleans, LA.

33.     Fourth, Sterling attended the NABSE[5] Conference in New Orleans, Louisiana.  The conference occurred from November 29, 2023 through December 3, 2023. Sterling traveled to the conference on November 28, 2023 and traveled from the conference on December 3, 2023.  Sterling booked – and PCPS paid for – ***one room*** for the trip.

---

[5] ̈NABSE is the "National Alliance of Black School Educators" *See* https://nabse.org/about/our-mission/ (visited on May 21, 2025).

10

34.     Pre-trip, Sterling submitted paperwork which identified the purpose of her travel as attending the "NABSE Conference" and described the mission of the NABSE. Her trip was fully approved by PCPS.

**(5)     AASA Conference – February 2024 – San Diego, CA.**

35.     Fifth and finally, Sterling attended the 2024 AASA annual education conference in San Diego, California. The conference itself took place on February 15-17, 2024, and occurred on site at the Marriott Marquis San Diego Marina hotel.

36.     Just as she did in 2023, however, Sterling also participated in the AASA's National Superintendent Certification Program (part two, for her).  And as before, the program preceded the conference by a few days.  It occurred on February 11-14, 2024, and also took place on-site at the Mariott Marquis San Diego Marina hotel.

37.     Sterling traveled to San Diego for these programs on February 11, 2024 and returned to Virginia on February 17, 2024.

38.     While in San Diego, Sterling stayed in two different hotels.  First, from February 11, 2024 through February 13, 2024, Sterling stayed two nights at the U.S. Grant Hotel.  Then, from February 13, through February 17, 2024, Sterling stayed four nights at the Mariott Marquis San Diego Marina hotel.

39.     Sterling was forced to utilize two hotels because, when her trip was initially booked, the Marriott did not have coverage for all of the days of the trip.  As such, Sterling's trip was booked, such that she would first utilize the U.S. Grant hotel for parts of the trip (the early days and the final days) if need be and utilize the Marriott for other parts of the trip (the in-between days).  As it turned out, the Mariott ultimately had lodging for the entire latter part of the trip and Sterling never needed to utilize her earlier reservations at the U.S. Grant hotel.

40.    In sum, when all said and done, Sterling used – and PCPS paid for – ___*only one room*___ for her at the U.S. Grant hotel and ___*only one room*___ for her– at the Marriott.

41.    Finally, as she had done with respect to all of her previous out-of-state travels, Sterling submitted a pre-trip travel summary related to the AASA events and identified her travel dates as February 11, 2024 through February 18, 2024.  As with all of her prior out-of-state travels, Sterling's San Diego trip was also fully approved by PCPS.

**C.    Hipolit Begins To Investigate Sterling's Out-Of-State Travels And Receives Specific Documents About What PCPS *Actually Spent* For Sterling.  She Also Learns Important Information About What Travel Expenses Are – And Are *Not* Paid – By Other Local School Divisions.**

42.    Notwithstanding that all of Sterling's travel expenses had been fully approved by the Chairman of the PCPS School Board (and thus by PCPS) and were for legitimate and professional purposes, WTVR, through Hipolit, decided to do an investigative report into whether Sterling's travel and expenses were above board.

43.    WTVR's investigation began in or around April of 2024, when Hipolit began sending VFOIA requests to PCPS.  In response to those requests, PCPS provided numerous records, including but not limited to, travel expense packets for all of the five out-of-state trips discussed above *and* several pages of expense ledger documents.  These latter documents corresponded to Sterling's travels *and* showed how much PCPS *actually paid* for Sterling's travels.

44.    At the same time, Hipolit also sent VFOIA requests to other local school divisions to inquire about the travel expenses of *their* superintendents.  Most notably, Hipolit sent requests to, and received information and documents from, the school divisions for Henrico County, Chesterfield County, Hanover County, and the City of Hopewell.

45.    As a result of Hipolit's VFOIA requests to the non-PCPS school divisions, she learned several important facts about the travel expenses for other school leaders.

46.     First, she learned that Henrico County was a member of the "Large Countywide and Suburban District Consortium," and that the consortium often paid for various travel expenses for its members to attend professional conferences.  She learned that the County's cost – annually – to be a member in the consortium is **$5,950**.

47.     Second, she learned that the consortium had, in fact, paid for some of the lodging and airfare expenses for Henrico County's School Superintendent, Dr. Amy Cashwell, when she attended the 2023 AASA annual education conference in San Antonio *and* the 2024 AASA annual education conference in San Diego.

48.     Third, she learned that oftentimes, speakers at the AASA annual conferences – such as both Dr. Cashwell (for Henrico) and Dr. Mervin Daugerty (for Chesterfield) – have some of their lodging and travel costs provided to them free of charge by the AASA.  Indeed, she learned that the AASA provided Dr. Cashwell with two nights of free lodging at both the 2023 and 2024 AASA annual conferences (at a value of **$662.26** and **$708.75** respectively), *and* she learned that the AASA provided Dr. Daugherty with two nights of free lodging at the 2024 AASA conference (at a value of **$670.30**). Further, she learned the AASA provided Dr. Cashwell a flight reimbursement of **$215.00** for the 2023 AASA conference and Dr. Daughtery a flight reimbursement of **$650.00** for the 2024 AASA conference. In other words, she learned that (i) Dr. Cashwell received **$877.26** in free travel expenses for the AASA 2023 conference; (ii) Dr. Cashwell received **$708.75** in free travel expenses for the AASA 2024 conference; and (iii) Dr. Daugherty received **$1,320.30** in free travel expenses for the AASA 2024 conference.

49.     Fourth and finally, she learned that, as a matter of practice, one local superintendent – Dr. Melody Hackney of Hopewell -- usually only traveled to conferences *in state*.

50.    Hipolit and WTVR knew all of these facts *before* WTVR published its May 21, 2025 about Sterling.

**D.    The May 21, 2024 News Story – "Lies, Damn Lies, And Statistics."[6]**

51.    On May 21, 2024, WTVR, on both its website and its television (CBS6) broadcasts, published a news story titled Extra hotel rooms, rental cars, and a $22,000 travel bill. What's going on with school leader spending?"  Both the text of the on-line version and the video of the television version of the story can be found at https://www.wtvr.com/news/local-news/petersburg-superintendent-travel-expenses-may-21-2024 (visited on May 20, 2025).  Both versions are sued upon in this lawsuit, and both are fully incorporated herein by reference to the website link.

**(1) The Numerous False Statements**

52.    To begin, both the on-line and television versions of the story contain numerous false and defamatory statements and implications.  They include, but are not necessarily limited to:

(a)    The headline of the on-line version[7] of the story falsely says
"***Extra***" hotel rooms"'

- In common usage, "extra" means "more than is due, usual or necessary"[8] Sterling, however, did not at any time as part of the trips highlighted by WTVR book, use or utilize any *extra* (i.e., unusual, unnecessary or undue) hotel rooms.

(b)    The on-line version of the story falsely says "Dr. Tamara Sterling ***charged taxpayers more than $22,000*** while traveling to conferences during her 15 months on the job"

---

[6] Mark Twain is reported to have said "There are lies, damn lies, and statistics." *See, e.g.* https://www.brainyquote.com/quotes/mark_twain_128372 (visited on May 20, 2025).

[7] Where both the on-line version of the story *and* the television version of the story contain the same false statements, they are both sued upon, although they will not be repeated

[8] https://www.merriam-webster.com/dictionary/extra (visited on May 21, 2025)

- Records in WTVR's possession do not show that Dr. Sterling charged even as much as $20,000, much less $22,000.

(c)     The on-line version of the story falsely says that "The **_$22,000_** bill was **_more than double_** what the Henrico County superintendent spent, **_14 times_** what the Hopewell superintendent spent, and **_43 times_** what the Chesterfield superintendent spent on travel during that same time frame.

- The is grossly inaccurate on multiple levels.

- First, it overstates the actual amount spent by PCPS on travel for Sterling.

- Second, it ignores the fact that Henrico County's Superintendent received at least **$1,586** in free lodging and airfare for two of the very same conferences that Sterling attended.

- Third, it ignores the fact that Henrico County pays **$5,980** annually into a consortium which provides it with substantial travel expense perks.

- Fourth, it ignores the fact that Chesterfield County's superintendent received at least **$1,320.30** in free lodging and airfare for the 2024 AASA annual conference that Sterling also attended.

- Fifth, it ignores the fact that even through Chesterfield County's _actual_ Superintendent (Dr. Daugherty) did not attend the 2023 AASA annual conference in San Antonio, Dr. John T. Murray, then the Executive Director for Constituent Services for CPCS (and, as of January 2025, the newly installed Superintendent for Chesterfield County), **_did attend in his place_** where he incurred at least **$684.69** in travel expenses (which were paid for by Chesterfield County) and also received two free nights of lodging from the AASA at a value of more than **$800.00**, for a total value of more than **$1,400.00**.

- Sixth, it ignored the fact that the City of Hopewell expressly told Hipolit that – _unlike_ some of her local counterparts – the Hopewell Superintendent usually

only traveled ***in state*** – necessarily negating any legitimate or reasonable basis for using her as a comparator vis-à-vis Sterling and her travel expenses.

- In sum, none of the statistical comparisons in the story are factually correct or accurate. Instead, they vastly overstate the percentages or multiples by which PCPS (for Sterling) outspent other localities on superintendent travel.

(d)   The on-line version of the story falsely says "At ***three*** of the conferences, Sterling booked ***more than one room*** for herself."

- This is false. At *most*, Sterling had two rooms at ***one*** conference (the one in Orlando, FL), but even then, the room was not *for her* (i.e., to *sleep in*), Rather, it was to be used as a workroom.

(e)   The on-line version of the story falsely implies that Sterling engaged in improper conduct when it says "At two conferences, even if she flew in the day before the conference and flew out the day after, she stayed ***three additional nights on the public's dime***."

- This text implies that Sterling's additional days at the conferences at issue (the two AASA annual conferences) were for pleasure and not for work-related purposes. In truth, in both instances, Sterling was there for the additional days because she was completing a professional certification program run by the same professional organization that ran the conference.

(f)   The on-line version of the story falsely evokes negative comments from a local parent accusing Sterling of "***spending $22,000 field-tripping around the country***."

- The comment is elicited based on false, incomplete, and misleading information that was provided to the parent by WTVR.

- The parent's use of the phrase "field-tripping"[9] falsely implies that Sterling was not doing any work or providing professional services to PCPS while on her travels.

(g)    Statements in the on-line version discussing Sterling's ***"abrupt"*** resignation within the same context as the false statements about her travel expenses falsely imply that Sterling left her employment with PCPS *because* of misusing, or concerns about misusing, PCPS funds pertaining to her travels.

- These implications are false. Sterling did not resign or otherwise leave her employment with PCPS because of her travel expenses or concerns about her travel expenses.

(h)    The on-line version of the story – in reference to the AASA 2023 annual conference – falsely states that "records show the school division paid ***$6,309.02*** for Sterling to ***book two rooms*** and stay for the entire week from February 12-19.

- The **$6,309.02** number is false. It is incorrectly based on a figure that includes a hotel reservation *estimate* number of ***$2,022*** that was never charged to, paid by, or incurred by PCPS or Sterling.

- The statement also falsely states that PCPS paid for two rooms for Sterling. This is not true and again is based on the false assumption (refuted by documents in Hipolit's possession at that time) that PCPS paid for two sets of rooms for Sterling.

(i)    The on-line version of the story – again in in reference to the AASA 2023 annual conference – falsely implies that Sterling engaged in wrongdoing with the statement that "Even if Sterling flew into the conference the day before and flew out the day after, ***taxpayers still paid for her to stay in San Antonio for three additional nights***."

---

[9] As commonly understood in the context used by the parent, "field tripping" connotes an escape from everyday work, such as " a journey by a group of associated peers, such as coworkers or school students, to a place away from their normal environment for the purpose of education ***or leisure***, either within their country or abroad." https://en.wikipedia.org/wiki/Field_trip (visited on May 21, 2025). *See also https://www.urbandictionary.com/define.php?term=field%20trip* ("a trip to a place usualy [sic] for educational purpose; ***an excuse to get out of school***") (emphasis added) (visited on May 21, 2025).

- This text implies that Sterling's additional days at the 2023 AASA conference were for pleasure and not for work-related purposes. In truth, Sterling was there for the additional days because she was completing a professional certification program run by the same professional organization that ran the conference.

(j)     The on-line version of the story compares Sterling to the Hanover County and Henrico County superintendents and falsely says: "Each only stayed for four nights, with the former spending **_$988.68_** to attend the conference, and the latter spending $2,224.09."

- This statement falsely *understates* the dollar amount actually attributable to the trip for the Henrico County superintendent because (i) it does not mention the fact that the AASA paid for two nights of lodging and a portion of airfare; and (ii) it does not mention the fact that some costs may have been reimbursed or reduced because the County pays more than $5000 a year to be a member of a school consortium.

(k)     The on-line version of the story – in reference to the Nevada trip in 2023 – falsely implies that Sterling engaged in wrongdoing with the statement that "Even if Sterling flew into the conference the day before and flew out the day after, **_taxpayers still paid for her to stay in Nevada for one additional night._**"

- This text implies that Sterling's additional day at the conference was for pleasure and not for work-related purposes. In truth, Sterling was in Nevada for an additional day so that she could network with like-minded colleagues.

(l)     The on-line version of the story – in reference to the SREB Making School Work Conference in July 2023 falsely states that "Records show that [Sterling] spent $3,877 on two separate rooms at the hotel **_for herself_**."

- This statement falsely states that Sterling had two rooms *for herself*, falsely implying that she was misusing the rooms or using them for personal/non-business-related purposes. In truth, the second room was booked to be used as a workroom and to store numerous professional materials.

(m)    The on-line version of the story – in reference to the 2024 AASA conference in San Diego – falsely implies that Sterling engaged in wrongdoing with the statement that "The actual conference was February 15-17, 2024, but ***taxpayers paid for her to spend seven nights there***."

- This text implies that Sterling's additional days at the conferences) were for pleasure and not for work-related purposes.  In truth, Sterling was there for the additional days because she was completing a professional certification program run by the same professional organization that ran the conference.

(n)    The on-line version of the story - in reference to the 2024 AASA conference in San Diego – falsely states "Records show [Sterling] ***spent $4,816 in San Diego where she booked two rooms at the conference hotel from February 13-16 even though she was the only attendee***."

- This statement is false in several respects.

- First, neither Sterling nor PCPS spent ***$4,816*** for the conference and no records support that amount.

- Second, Sterling did not book *or pay for* two rooms at the conference hotel from February 13-16.  She only booked ***one room***.

(o)    The on-line version of the story -- in reference to the 2024 AASA conference in San Diego – falsely compares Sterling with Henrico County's and Chesterfield County's superintendents travel costs, saying that Henrico spent "***$1,171.20***" and Chesterfield spent "***$514***."

- This comparison is false for several reasons.

- First, it ignores the fact that Henrico County's superintendent received at least ***$708.75*** in free lodging for the 2024 AASA conference.

- Second, it does not mention the fact that some costs may have been reimbursed or reduced because Henrico County pays more than $5000 a year to be a member of a consortium.

- Third, it ignores the fact that Chesterfield County's superintendent received at least ***$1,320.30*** in free lodging and airfare for the 2024 AASA annual conference.

- In short, the comparison misleadingly compares the travel of the three superintendents by understating the costs associated with the travel of the Henrico County and Chesterfield County superintendents.

(p)    The on-line version of the story states that both the Henrico County and Chesterfield County superintendents were speakers as that 2024 AASA and states that the AASA "***reimburses speakers for some travel expenses related to the conference for speakers***."  However, it creates the false impression that any such reimbursements must be minimal because it does not include either the potential value of the reimbursement ***or*** the actual details of the reimbursements (such as the fact that the AASA gave two nights of free lodging to both Dr. Cashwell and Dr. Daugherty, while Sterling had to pay for those same two nights through no fault of either her or PCPS.

(q)    The on-line version of the story creates the false implication that Sterling has misused public funds with her travel expenses and violated the law in doing so.  By presenting falsely inflated and out-of-context information to both a local parent and Sen. Aird, WTVR invited and evoked falsely-premised calls for investigations into Sterling and her travel expenses, to wit:

- In responding to Hipolit's question (which is derived form Hipolit's false portrayal of Sterling) "Do you think this maybe deserves a closer look?," the parent's statement of "Yes yes I definitely do . . . If money is that tight and we're ***spending over $20,000 on field trips for the school superintendent***, just ***doesn't make sense to me***" falsely implies that Sterling has engaged in improper behavior that needs to be further investigated.

- Hipolit also falsely portrays Sterling to Sen. Aird when she shows her WTVR's "findings" and invites her to then comment on the findings. Sen. Aird's subsequent response of "There just really is ***no rationale*** that can be used to explain ***the excess*** that's appearing in the records ***that you found***" then falsely implies that Sterling has misused public funds in a way that cannot be rationally explained.

- Hipolit further falsely portrays Sterling to Sen. Aird when she asks the senator the falsely-premised question: "What do you think about getting **_two rooms_** at a conference **_for yourself_**?" to which the senator replies "Could not explain it if I tried." This falsely implies that Sterling has misused public funds in a way that cannot be rationally explained and must be the result of improper behavior.

- Hipolit further falsely portrays Sterling to Sen. Aird when she asks the falsely-premised question; "Do you think it's fair to **_book a whole week_** at the site when the conference is **_only a couple of days_**?" to which the senator replies **_"Not on the public's dime_** . . .When you're talking about adding additional days or additional time spent, that should **_not be at the public's expense._**" This falsely implies that Sterling has engaged in improper behavior, has used public funds for personal use, and has otherwise misused public funds.

- Hipolit further invites false implications from Sen. Aird by publishing her comments that "The school board chairman will have to have increased scrutiny when approving these [travel] requests and these expenditures **_unfortunately because of what we're seeing today_**." This call for increased "scrutiny" falsely implies that Sterling has engaged in improper behavior, has misled PCPS in her travel forms, and has misused public funds.

- Hipolit further falsely portrays Sterling when she invites the comment from the local parent that "I think the school board needs to **_seriously look into this_**." This falsely implies that Sterling has engaged in improper or illegal behavior that needs to be investigated.

- The story falsely implies that Sterling's prior travel expense conduct is wrongful, improper, and/or illegal when it says "Sen. Aird said she is now working with the Virginia Department of Education to ensure greater **_enforcement_** and **_oversight_** of Petersburg schools so **_something like this does not happen again._**"

(r)   The on-line version of the says that when Sterling completed her pre-trip travel expense to submit to PCPS Chairman Kenneth Pritchett for the 2023 AASA conference in San Antonio, she "did not tell Pritchett in the form all the dates that she would be staying there."

- This is false.  Sterling clearly told Pritchett the dates of her travel on the form and she did indeed attend the conference *and the certification program* during the identified time period.

53.   The television version of the story contains all of the same above statements – which are just as false and defamatory on air as they are in print.  The television version of the story goes further, though, using such things as ominous and foreboding music, negative voice inflections by Hipolit, harsh and judgmental voice tones from Sen. Aird, and the clearly upset and agitated demeanor of the local parent to heighten the defamatory meaning of the story.  All of these additional elements create the false impression – over and above the false and defamatory text of the statements at issue – that Sterling engaged in improper, wrongful, and illegal behavior as to her travel expenses.

### (2) False Graphics

54.   Both the on-line and television versions of the story also contain numerous false and misleading graphics.  Not all of them are catalogued and set forth here, but the following are some of the more egregiously false and defamatory graphics.

55.   First, both the on-line version of the story and the television version of the story use a color graphic that purports to compare the amounts spent by Sterling, on the one hand, and the superintendents from Henrico County and Hanover County, on the other, for travel expenses related to the 2023 AASA annual conference in San Antonio, Texas.  As shown below, resting on the (false) assumption that Sterling should have only stayed four nights at the conference in the first place (and thus, comparing applies to oranges), it portrays Sterling as spending $6,309.02; Dr. Cashwell as spending $988.86, and Dr. Gill as spending $2,224.09.

22

**False Graphic**



56.    However, the graphic *overstates* Sterling's expenses and *understates* the value of Dr.

Cashwell's expenses.  Even setting aside apples versus oranges, a true graphic would be as follows:

**True Graphic**



57.    Second, the television version of the story reveals that WTVR showed the local parent in the story materials that were specifically *created* by WTVR – instead of the actual source materials provided to WTVR via its VFOIA requests.  The following images show WTVR's false assessment of Sterling's travel, rather than the *truth* about her travel.





58.     Third, using calendar images, the television version of the story intentionally creates a stark distinction between the *actual dates* of Sterling's conferences and the *total number of days* she stayed at the conference's location.  These distinctions are most prominent for the two AASA conferences. For both such conferences, WTVR published a calendar graphic of *just the days of the conference in* <span style="color:yellow">**yellow**</span> and then added the allegedly unexplained *additional dates* in <span style="color:orange">**orange**</span> or <span style="color:darkred">**dark red**</span>.

**2023 AASA Conference in San Antonio**

**2024 AASA Conference in San Antonio**

The clear implication from these color contrasts is that the yellow represents above-board conduct whereas the red and orange represent sinister and improper conduct.

59.    Fourth, WTVR used a multi-picture (and, again, false) graphic to try to show that, for the 2024 AASA conference, Sterling incurred expenses for two sets of rooms at two different hotels, in somewhat overlapping fashion.



60.    The graphic is false in several respects.  First, Sterling did not utilize two rooms at the Marriott on the 13th through the 16th (i.e., the farthest left picture).  Second, she did not have double rooms at the Marriott on the 16th (as implied in the middle picture).  And third, she did not stay at the hotel in the third (farthest right) picture from the 16th to the 18th.

61.    As previously explained, the truth is that due to availability issues at the Marriott (where the conference was located), Sterling had to stay *first* at the hotel portrayed with the picture on the farthest right, then she was able to stay at the Marriott for the remainder of her time in San Diego.  She *never* stayed at the non-Mariott hotel on the 16th through the 18th, and indeed, she actually returned to Virginia on February 17, 2024.

62.    Fifth, similar to its graphic for the 2023 AASA annual conference, WTVR's television version presents an ostensible three-superintendent comparison for the travel expenses for the 2024 AASA annual conference.  Again, it is false.

**False Graphic**



**True Graphic**



63.    As a final graphic (at least for illustration purposes here in this Complaint), WTVR, in its television story, tries to portray a global comparison of the travel expenses of various local school superintendents.



64.    As previously explained, however, the graphic is grossly inaccurate as to virtually all of its expense numbers and, moreover, is wholly misleading as to Hopewell, which expressly told WTVR that its school superintendent usually travels only to in-state conferences.

### (3) Overall False Implications

65.    In total, when the false and defamatory statements and implications from the news story are viewed, individually and collectively, they paint the clear picture of Sterling as someone who abused the public trust and misused public funds.

66.    The story also directly implies that Sterling engaged in criminal behavior. Under Va. Code § 18.2-112.1, any full-time public official such as Sterling who "uses or permits the use of public assets for private or personal purposes unrelated to [her] duties and office" is guilty of a crime. Here, WTVR all but came out and made this precise accusation.

**E.    WTVR's Audience Immediately Understands, Accepts, And Believes The False Narrative From The May 21, 2024 Story.**

67.    Almost as soon as WTVR broadcast its false May 21, 2024 story about Sterling, its audience embraced the false narrative in the story. That is, WTVR's viewing public interpreted its false story as falsely saying that Sterling was criminally misusing public funds.

68.    Evidence of the public's acceptance of WTVR's false narrative is most notably found in the comments made by Facebook users on WTVR's Facebook post about the story.



69.     In short, the reputational damage caused by WTVR's false narrative about Sterling – and persons believing the false narrative -- was both immediate and public.  Indeed, as of today's date, these comments remain viewable on WTVR's Facebook page.

**F.    Hipolit And WTVR *Knew* That Their False Narrative About Sterling Was False.**

70.     As a final matter, Hipolit and WTVR *knew* that their false narrative about Sterling was false.  This is the case for at least four reasons.

71.     First, many of the news story's expense numbers were directly refuted by documents that WTVR and Hipolit had in their possession *prior to publication*. For example, Hipolit *knew* and/or had obvious reasons to believe that it was highly likely that her $6,309.02 expense number for Sterling for the 2023 AASA conference was false.  This is because it is based on a calculation that *includes* a **$2,022** expense for a hotel room that (i) is listed *only* on a document that has the words "Upcoming Reservations" on the top of both pages of the document and says "We look forward to greeting you soon"; (ii) *unlike* other expenses in Hipolit's possession at the time, does not indicate a *charge* to any credit card used by Sterling; and (iii) contains *no* corresponding number on the PCPS account ledger that was produced by PCPS to Hipolit via VFOIA.  In other words, as is obvious from the face of the document – and as *would have been obvious to anyone looking at that document together with all of Sterling's <u>other</u> travel paperwork* – the document is a pre-stay estimate for a room that was never used and whose charges were never incurred or billed to PCPS.

72.     In that same vein, Hipolit knew or had obvious reasons to believe that it was highly likely that her claim that Sterling billed PCPS for two rooms at that conference was also false.  This is because this claim too rested on the *pre-trip* estimate document, rather than a document showing actual charges and reimbursements for **two hotel rooms** at that conference.

73.    Second, on a more macro level, Hipolit and WTVR knew that their false narrative about Sterling using an inordinate amount of money to travel when compared with her contemporaries from other local school divisions was false.  Hipolit knew, for example, that both Dr. Cashwell (twice) and Dr. Daugherty (once) had received subsidies or outright "freebies" when it came to lodging and travel at the two AASA conferences.  Yet, Hipolit made no mention of the details of those subsidies and, even when she did vaguely mention that Drs. Cashwell and Daugherty were speakers at the 2024 AASA conference who might have received reimbursements, she failed to explain what they were. And, of course, she wholly failed to mention – or even acknowledge -- the reimbursements applicable to the 2023 AASA conference.

74.    Third, Hipolit and WTVR knew full well that including expenses for the City of Hopewell was an invalid comparison on its face.  Specifically, even though Hipolit talked about "travel" expenses in generalized terms, she failed to tell the public that the *reason* that the City of Hopewell's expenses were so low is because

75.    Fourth and finally, neither Hipolit nor WTVR had any factual reason or basis to claim or imply that Sterling had *misused* public funds or had resigned her position with PCPS *because of* concerns about travel funds.  Yet, with her third-party questions about "looking into" Sterling's travel expenses, her publication of negative and pejorative "field tripping" and "blowing money" comments from a local parent, and her publication of  Sen. Aird's comments such as "not on the public's dime," Hipolit knowingly created a false narrative that Sterling had been abusing and misusing – even criminally misusing – public funds for her travels and had resigned as a result.  There is nothing in Sterling's travel documents from PCPS that would have allowed Hipolit or WTVR to reach, much less publish, such allegations or implications.

G.    **WTVR's Defamatory Statements Have Substantially Harmed Sterling.**

76.    As a result of WTVR's defamatory statements and implications about her in its May 21, 2024 news story, Sterling has suffered, and continues to suffer, substantial emotional and reputational harm, for which WTVR bears responsibility.

**COUNT I -- DEFAMATION**
**(AGAINST WTVR)**

77.    The allegations of paragraphs 1-76 are realleged as if fully set forth herein.

78.    Sterling has been defamed by WTVR's false statements and false implications from its statements, graphics, and other accoutrements used in its television broadcast of its May 21, 2024 story about her professional travels while serving as the PCPS Superintendent. These false statements and implications are specifically referenced and previously set forth in (i) paragraphs 52(a)-(r) of the Complaint; (ii) paragraph 53 of the Complaint; (iii) the graphics discussed and set forth in paragraphs 55 through 64 of the Complaint; (iv) paragraphs 65 and 66 of the Complaint; and (vi) all of these same paragraphs viewed in connection with each other (which separately and collectively, weaved together the false narrative that Sterling abused the public trust placed in her as to her travel expenses, misused her travel expenses, frolicked on leisure trips on the public's dime and/or committed criminal misconduct as to the use of public funds).

79.    These false statements were published, and they were made with the requisite intent to defame Sterling.

80.    The statements at issue are false and purport to be statements of fact, not statements of opinion.

81.    Moreover, the false statements all involve the efforts of WTVR to demean and disparage Sterling and to falsely accuse her of criminal conduct, unprofessional occupational

32

activities, and unfitness to perform the duties of her job, and thus these statements constitute defamation per se.

82.     As a proximate cause of the conduct of WTVR, Sterling has suffered substantial compensatory damages, including severe mental and emotional distress, reputational harm, loss of sleep, humiliation, embarrassment, loss of time, and other damages. She is also entitled to presumed damages.

83.     In addition, the false statements made about Sterling by WTVR were made intentionally, willfully, and maliciously against Sterling and with utter and conscious disregard of her rights.

84.     Just as important, WTVR's defamatory statements were made with *New York Times* "actual malice," a necessary element of Sterling's defamation claim here.  As explained in, especially paragraphs 70 through 75 of the Complaint, when WTVR published its false statements about Sterling, it either *knew* that its statements about her were false or it published them with a high degree of awareness that they were probably false.

85.     Finally, no privileges, qualified or absolute, attach to these statements, therefore, and Sterling is also entitled to punitive damages in this matter.  Indeed, WTVR's statements not only were contradicted by information it (through Hipolit) already had in its possession, but they were broadcast in an intentionally sensationalist manner.

WHEREFORE, Sterling respectfully and specifically requests the following relief against WTVR:

(a)    Compensatory and presumed damages in the amount of TEN MILLION DOLLARS ($10,000,000.00), or some amount as may be determined at trial, to compensate Sterling for all of the damages associated with the WTVR's defamation of her;

(b)    Punitive damages in the amount of three hundred fifty thousand dollars ($350,000) dollars;

(c)    Pre-judgment interest; and

(d)    Associated expenses and costs related to this action and all other such relief as is just and proper.

**A TRIAL BY JURY IS DEMANDED**.

Respectfully submitted,

TAMARA STERLING, Ed.D.

By ___/s/Richard F. Hawkins, III_____
                        Of Counsel

Richard F. Hawkins, III (VSB #40666)
THE HAWKINS LAW FIRM, PC
2222 Monument Avenue
Richmond, Virginia 23220
(804) 308-3040 (telephone)
(804) 308-3132 (facsimile)
rhawkins@thehawkinslawfirmpc.com

Counsel for Plaintiff